IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 6, 2012

**NICHLOUS MAXWELL v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 03-08392      Chris Craft, Judge**

**No. W2011-01219-CCA-R3-PC  - Filed May 18, 2012**

The petitioner, Nichlous Maxwell, appeals the denial of his petition for post-conviction relief, arguing that trial and appellate counsel were ineffective for failing to argue for a jury instruction on facilitation of a felony.  Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Neil Umsted, Memphis, Tennessee, for the appellant, Nichlous Maxwell.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Marianne Bell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner, who was indicted for the May 26, 2003 first degree premeditated murder of Prentice Moore, was convicted by a Shelby County jury of second degree murder and was sentenced by the trial court to twenty-five years in the Department of Correction. This court affirmed his convictions on direct appeal but modified his sentence to twenty-three years, and our supreme court subsequently denied his application for permission to appeal. State v. Nichlous Maxwell, No. W2006-01213-CCA-R3-CD, 2008 WL 4613878, at *1 (Tenn. Crim. App. Oct. 15, 2008), perm. to appeal denied (Tenn. Mar. 23, 2009).  Our direct appeal opinion contains the following summary of the evidence presented at trial:

In the early morning hours of May 26, 2003, Prentice Moore (also known as "Twin One") was shot and killed in the parking lot of an Exxon gas station in Memphis. Earlier that morning, [the petitioner] and the victim were involved in an altercation at the Denim and Diamonds nightclub. Gregory Livingston, the director of security for the club, was summoned to the security office via portable radio after one of his employees reported a fight that had occurred at the pool tables. When Mr. Livingston arrived at the office he found the victim and his twin brother, Prenston Moore (also known as "Twin Two") there. Mr. Livingston found the twins to be agitated and upset. When Mr. Livingston asked the twins what happened, the victim responded that "some other guys jumped him and his brother." The victim also informed Mr. Livingston that [the petitioner] said he was going to kill them. Because the twins were concerned for their safety, the security guards escorted them out of the building about thirty minutes after the fight occurred.

Prenston Moore testified that the problems between the victim and [the petitioner] began in October 2002 when [the petitioner] poured a beer on the victim's girlfriend. This caused a fight between the victim and [the petitioner] at the nightclub. The fight was broken up by security and both men went on their way. The victim and Prenston Moore did not see [the petitioner] again until the night of May 25, 2003 at the nightclub. When Prenston Moore, the victim, and their friends were leaving the club in the early morning hours of May 26, 2003, they walked past [the petitioner]. Prenston Moore testified that he heard [the petitioner] say he was "dumping n-----s." Prenston Moore stated that this statement was slang for killing someone. After this comment, the victim began fighting with [the petitioner]. Prenston Moore joined the fight and hit [the petitioner] several times with a pool cue and then chased him out of the nightclub.

After being escorted out of the club by security, the victim, Prenston Moore, and their cousin, Pat Grant, drove to a nearby Exxon station. The victim was driving the car, while Prenston Moore was in the backseat and Mr. Grant was in the front passenger seat. After circling the Exxon parking lot twice, the men stopped in the parking lot. Very soon after parking, Prenston Moore heard shots fired. The victim reached in the backseat and pushed Prenston Moore's head down. At this point, Prenston Moore felt blood fly into his face and he thought he had been shot. Within a few seconds, however, he realized that it was the victim who had been shot. Prenston Moore looked to the back of the vehicle and saw a bullet hole. Prenston Moore also saw a person he identified as [the petitioner] running away from the rear of the car.

Prenston Moore testified that [the petitioner] was carrying an assault rifle. Prenston Moore stated that he did not see anyone with [the petitioner] and that, even though [the petitioner] had something covering part of his face, he recognized [the petitioner] by his bald head. During the incident, Prenston Moore heard three or four shots fired and testified that all the shots were fired from the rear of the vehicle. After the shots stopped, the victim "pulled off" the lot onto Mendenhall and hit another car. The victim was able to drive a short distance further to Cottonwood and then "fell back." Prenston Moore grabbed the wheel and managed to stop the car. Once the car was stopped, Prenston Moore pulled the victim out of the car and covered him up.

Edward Reynolds, Omar Edwards, and Roy Washington were friends of the victim and were with him at the nightclub that night. Mr. Reynolds and Mr. Edwards saw the fight between the victim, Prenston Moore, and [the petitioner]. Mr. Reynolds, Mr. Edwards, and Mr. Washington left the club after the fight in Mr. Edward[s'] white Tahoe. The men also drove to the Exxon station and circled the parking lot. They then pulled up next to a gas pump, and the victim was on the other side of the same gas pump. Mr. Reynolds looked back and saw [the petitioner] holding an assault rifle. Mr. Edwards saw [the petitioner] carrying a gun with a "banana clip." Mr. Washington saw [the petitioner] carrying a "machine gun with a long clip." All three men acknowledged that [the petitioner] had something covering part of his face, but they could tell the [the petitioner] was bald. None of the men saw another person with [the petitioner]. Mr. Reynolds saw the victim push Prenston Moore's head down before he was shot. Mr. Edwards saw a bullet "knock out" the back window. Mr. Washington saw a bullet strike the victim.

Bryan Cohran was also at the Exxon station early that morning. Mr. Cohran was not a friend of the victim or [the petitioner], but was "relieving himself" behind the Exxon station when he saw [the petitioner] and a taller, lighter complected man run towards the victim's car and start shooting. Mr. Cohran noticed that the [the petitioner] had an assault rifle and the other man had a handgun. Mr. Cohran saw shots fired from the rear of the victim's vehicle. After [the petitioner] and the other man fired several shots, they ran back the way they came, and someone in a green Tahoe started shooting at them.

Inside the green Tahoe were Tim Scott and Larry Moore. Mr. Scott had followed the victim and Mr. Edwards from the club to the Exxon. When they arrived, they could not find a parking space and were waiting for someone to

leave when they saw two men come around the building. Both men testified that the bald man (identified as [the petitioner]) was carrying an assault rifle and the other man was carrying a handgun. Both men also testified that the man carrying the assault rifle had gold teeth. At trial, [the petitioner] demonstrated for the jury that he has gold teeth. Larry Moore testified that he saw [the petitioner] fire several shots and that he saw the other man shoot. Larry Moore also saw the victim push Prenston Moore's head down before he was shot. Mr. Scott began shooting at [the petitioner] and the other man once he realized what was happening.

Fredrick Rodgers also witnessed the fight at the club and the shooting at the Exxon. He saw [the petitioner] carrying an assault rifle and fire into the back of the victim's car. Mr. Rodgers also stated that there was another man with [the petitioner] and that he recognized [the petitioner] because of his gold teeth.

Several members of the Memphis Police Department testified for the State. Officer David Payment testified that he investigated the area at Cottonwood and Mendenhall where the victim's car came to a stop as well as the Exxon station where the shooting occurred. At the Cottonwood scene Officer Payment recovered a spent nine millimeter shell casing (fired into the air by Mr. Grant when a car drove by after Prenston Moore had pulled the victim out of the car) and a live nine millimeter bullet near the victim's car. He also recovered a nine millimeter handgun from the victim's car. Prenston Moore testified that the victim carried a gun in his car. At the Exxon station, Officer Payment recovered three spent 7.62 x 39 shell casings, four spent nine millimeter shell casings, and a nine millimeter bullet fragment on the front dash of the victim's car. Officer Payment also testified that the front windshield of the car had a bullet hole in it, although he was unable to testify as to whether the bullet hole was an entrance or exit hole. Sergeant James Fitzpatrick testified that he observed two bullet holes in the rear window of the victim's car. In Sergeant Fitzpatrick's opinion, the bullet fragment found on the front dash came from the rear of the vehicle, hit and passed through the victim, struck the front windshield, and then "lost its power and bounced back."

Sergeant John Palsey identified [the petitioner] as a suspect. Several eye witnesses identified [the petitioner] in a photo spread and also mentioned another man named either Terrell or Chris. The officers were not able to positively identify this person, although they did confirm that there were nine

millimeter shell casings found at the Exxon station consistent with a second shooter.

Dr. O'Brian Cleary Smith, the Shelby County Medical Examiner, performed the autopsy on the victim's body. Dr. Smith determined that the victim was killed by a high velocity gunshot wound that entered through his right eye and exited through the back of his head. Typically, an example of a high velocity gun is an assault rifle, and a handgun is not a high velocity weapon.

Monica Allen, [the petitioner]'s girlfriend at the time of the shooting, testified on his behalf. Ms. Allen testified that she saw the fight at the club and saw [the petitioner] run out of the club. Ms. Allen testified that she left a short time later after "the crowd cleared out." When Ms. Allen arrived home, [the petitioner] was there with injuries sustained from the fight. She testified that she gave him a rag to clean himself with and then they both went to bed. She was unsure of the time they went to bed but guessed it was around three o'clock in the morning. Ms. Allen also agreed on cross-examination that because she was asleep she did not know if [the petitioner] left during the night, even though he was there when she woke up the next morning.

Id. at *1-3.

On January 25, 2010, the petitioner filed a petition for post-conviction relief in which he raised claims of ineffective assistance of trial and appellate counsel based on a number of allegations of deficient performance. On October 13, 2010, he filed an amended petition in which he alleged that trial counsel was deficient for not requesting a jury instruction on facilitation as a lesser-included offense and not raising the issue on appeal. The petitioner further alleged that, were it not for these deficiencies of counsel, there was a reasonable probability that the outcome of his trial would have been different, as there was sufficient evidence for the jury to have found him guilty of having facilitated the murder of the victim rather than having committed it himself.

We confine our summary of the evidentiary hearing proceedings to the evidence that is relevant to the issue raised on appeal. Trial counsel, who graduated law school in 1994 and whose practice consisted of ninety-nine percent criminal defense, testified that the petitioner's mother retained her to represent the petitioner after his original counsel was relieved due to a conflict. Original counsel gave her his file, and she also worked closely with an investigator that had been obtained to help prepare the petitioner's case. Trial counsel said that their defense strategy consisted of an alibi defense, as the petitioner

maintained from the beginning that he had been with his girlfriend at the time of the shooting. She said she was aware from witness statements she reviewed before trial that the State had two or three witnesses who were going to identify the petitioner as the shooter. However, when it came down to the trial, "it seemed like every single witness that took the stand that day . . . suddenly ha[d] a better memory than . . . before," and the number of witnesses who identified the petitioner more than doubled. She said she attempted to discredit these witnesses by cross-examining them about their personal relationships with the victim and his brother and their possible gang affiliations.

Trial counsel acknowledged that she attempted to bring out at trial the fact that there had been "ongoing hostility" between the petitioner and the victim and his twin brother. She explained, however, that she did so in order to show that the petitioner's pattern of behavior in the face of the victim's and his brother's attacks was always to run away and not to return to the fight.

Trial counsel testified that she strenuously opposed the State's request for a jury instruction on criminal responsibility because she believed it was inappropriate and would be confusing to the jury. The petitioner was the only person indicted for the crime, and she believed that the evidence at trial, which included testimony about multiple gunshots coming from different directions, did not show that the petitioner was "acting with anyone else or would know that anyone else was out there going to do these things." Trial counsel testified she did not want to "compound the error" of the trial court's issuing an instruction on criminal responsibility by requesting an instruction on facilitation, which, in her view, would have only "mudd[ied] the water." She explained:

> A.    If I'm against criminal responsibility I think I have - - even though they give criminal responsibility I don't think I have to help in the error by saying well, while you're there why don't we just go on and throw in facilitation. I think that would have made it worse.
>
> Q.    And you don't think it would have been beneficial to [the petitioner's] defense?
>
> A.    I don't know how when your position is alibi you suddenly asking for facilitation helps your alibi defense.

Trial counsel acknowledged that she addressed the lesser-included offenses to murder in her closing argument but said she did so without abandoning the alibi defense:

> And the way we tried to approach that was maintain the alibi because

-6-

that was his position that he was not there, that he was somewhere else. But to make sure the jury understood that given what the testimony had been it could very well be that one of those other people out there who had nothing to do with our client was the one that caused the death.

Even if they chose to believe our client was out there they still had those other people acting without him being involved at all. And that's what I thought was the appropriate way to do it to present this to they jury we're still holding to our alibi.

But if you think he died look at it very carefully because there's a shooting from the front, there's Mr. Scott, there's this other person that some people say it's Chris, some people say it's not Chris. Think before you make your decisions and realize that you've not been really shown who the shooter was.

. . . .

And in that way we could approach criminally negligent homicide, vol-man . . . and reckless . . . [w]ithout abandoning what . . . the course would have been on throughout.

On cross-examination, counsel reiterated that she had made a strategic choice not to request an instruction on facilitation because she believed it would have hurt, rather than helped, the petitioner's case. She also acknowledged having told the jury in her closing argument, "I'm not sure why I'm going over these [lesser-included offenses] because [the petitioner] wasn't there, perhaps I'm going over them for the other shooters."

The petitioner testified that he maintained throughout that he had not been present at the time of the shooting.

## ANALYSIS

The petitioner argues that trial counsel was deficient for not requesting a jury instruction on facilitation and not preserving or raising the issue for appeal. In support, he cites this court's decisions in Michael Davis v. State, No. W2009-02111-CCA-R3-PC, 2010 WL 2539689 (Tenn. Crim. App. June 23, 2010), and Montea Wilson v. State, No. W2008-02439-CCA-R3-PC, 2010 WL 3822934 (Tenn. Crim. App. Sept. 30, 2010), in which the petitioners' respective counsel were found to be ineffective based on their failure to request lesser-included offense instructions or to preserve the issue on appeal. The State responds

by arguing that the case at bar is distinguishable on its facts and that the post-conviction court properly found that the petitioner failed to show that his counsel was deficient for not requesting that the jury be instructed on facilitation, or that he was prejudiced as a result. We agree with the State.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability

sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

In denying relief, the post-conviction court found that trial counsel had made a reasonable, strategic choice not to request an instruction on facilitation and that the petitioner could not show, under the facts of the case, that he suffered any prejudice as a result of the lack of a facilitation instruction.

The record supports the findings and conclusions of the post-conviction court. Trial counsel explained at great length why she did not want to request an instruction on facilitation, testifying that she thought it would have undermined their alibi defense and further added to the jury confusion caused by the criminal responsibility instruction. In addition, she thought that even if the jury disbelieved the alibi witness and thought the petitioner was present during the shooting, the State failed to present proof sufficient for a jury to find that the petitioner facilitated the crime.

We agree with the State that our decisions in Michael Davis and Montea Wilson are distinguishable from the case at bar. In Montea Wilson, this court concluded that counsel was deficient for not preserving as an issue for appeal the trial court's failure to instruct the jury on second degree murder as a lesser-included offense of felony murder, despite the fact that counsel "may have made [a] strategic decision not to ask for the instruction," because there was sufficient evidence to support the lesser-included offense. 2010 WL 3822934, at *14-15. In the case at bar, trial counsel reasonably believed that the evidence did not support a jury finding that the petitioner facilitated the crime. She also believed that an instruction on facilitation would confuse the jury and undermine her alibi defense.

Michael Davis v. State is also distinguishable from the case at bar. The petitioner in Michael Davis was found guilty of especially aggravated robbery under a theory of criminal responsibility. 2010 WL 2539689, at *1, 5. The victim was a laudromat attendant who was accosted by four or five armed and masked men early in the morning at his place of employment. State v. Michael Davis, No. W2006-01151-CCA-R3-CD, 2007 WL 2247254, at *1-2 (Tenn. Crim. App. Aug. 3, 2007), perm. to appeal denied (Tenn. Jan. 28, 2008). The men struck the victim in the head, robbed him of his watch and jewelry, blindfolded and bound him, carried him to a pickup truck, shot him in the leg, removed his car keys and wallet, and drove him around before shoving him out of the truck. Id.

Approximately an hour and a half after the men entered the laudromat, the victim's brother arrived at the business in time to witness the petitioner, with whom he was familiar, driving off in the victim's vehicle. In addition, police later found abandoned a stolen pickup truck with blood in the backseat, a mask, a bloody towel, and, affixed to the rear, a dealer's

drive-out tag that was linked to the petitioner.  Id.

Trial counsel's defense strategy consisted of an attempt to show that the petitioner was not present and had nothing to do with the crimes.  Michael Davis, 2010 WL 2539689, at *3. Nonetheless, counsel argued in closing "that if the petitioner was guilty of anything, it was only theft or possession of stolen property."  Id.  Counsel could not specifically recall whether he requested lesser-included offense instructions, and instead "indicated . . . that he presumed that the trial court would have automatically included any applicable lesser-included offenses[.]"  Id. at *6.  Based on the specific facts involved in the case, this court concluded that counsel was deficient for failing to request a jury instruction on facilitation and that the petitioner was prejudiced as a result.  Id. at *6-7.

Trial counsel in the case at bar, unlike the counsel in Michael Davis, was clear that she made a strategic choice not to request an instruction on facilitation because she believed the facts did not support a finding of facilitation and the instruction would only confuse the jury and hurt the petitioner's case.  Moreover, she found a way to address lesser-included offenses in closing without abandoning the petitioner's alibi defense.  Thus, given the facts of this case, we conclude that the petitioner has not shown that counsel was deficient for not requesting a jury instruction on facilitation, or that he was prejudiced by her failure to do so.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court denying the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE